This bill is filed to annul certain conveyances made by complainants to defendant De Stephano, alleged to have been made under duress, and for other incidental relief, joined with which is a prayer for an accounting as between the complainants Francesco Ebell and his co-partner De Stephano.
In the latter part of March, 1922, Francesco Ebell and the defendant Rodermond engaged in a joint adventure in foreign exchange, whereby Rodermond invested the sum of $13,700 as the capital for the enterprise, and Ebell contributed his services in the management of it. It was agreed that Ebell should retain $1,100 of this amount as his own money, and the balance of $12,600 was to be utilized in the *Page 30 
business. Ebell was a broker in New York City of many years' experience. The exact method by which the enterprise was carried on does not clearly appear from the testimony, but there is sufficient evidence to show that to some extent it was conducted upon margins and futures. This appears affirmatively upon the face of the written agreement between the parties at the time of the formation of the partnership. Rodermond was to receive seventy-five per cent. of the profits, and the balance was to be retained by Ebell. The sum contributed by Rodermond was stated in the agreement to be for the joint account of Rodermond and Ebell for operation in foreign exchange under Ebell's discretion. Inspection of the books and records could be had by Rodermond or his attorneys at any time, and it was agreed that the account could be closed upon ten days' notice to Ebell.
The business of the partnership seems to have been directed chiefly towards dealing in German marks, and the venture soon ended in disaster.
On or about June 17th, 1922, Ebell notified Rodermond and De Stephano, who appears to have made the advances to Rodermond, that the account was about exhausted, and that additional money was required in order to meet the demands of brokers for further advances on the existing margins. De Stephano was willing to advance more money, but Rodermond was unwilling to do so. Ebell thereupon agreed to contribute the additional funds himself if De Stephano would furnish them to him on a mortgage. This De Stephano agreed to do.
On June 19th a bargain and sale deed was drawn by De Stephano's attorney and executed by Mr. and Mrs. Ebell, conveying the real estate of Mrs. Ebell to De Stephano. This was property which had always been in her name and which she had bought with money inherited from her grandfather. Upon this security, Ebell was to receive $3,000 from De Stephano.
The testimony in question shows that the bargain and sale deed was intended to be simply a mortgage, although it contained *Page 31 
no clause of defeasance. The deed was placed upon record the same day that he was requested to call at the office of De Stephano's or Rodermond's attorneys in New York, and he was there served with a notice terminating the partnership. Rodermond had, meantime, assigned all his interest in the partnership to De Stephano, who claimed at that time to have Rodermond's interest therein. Ebell requested the payment to him of the $3,000 which he was to receive under the mortgage, but he was put off by De Stephano. That same evening, however, De Stephano and Rodermond called at Ebell's home in Weehawken, New Jersey, for the purpose of settling the matter, as they said, although, at that time, Ebell stated that he preferred to defer it. During the discussion which took place there mention was made of the fact that Ebell had overdrawn his account with the firm, and De Stephano thereupon said that he would let him have no money, and that he would put the matter in the hands of the district attorney for prosecution. Ebell protested that his accounts were straight and that no moneys had been withdrawn except with the full knowledge and acquiescence of Rodermond, who had been always present in the office during the transaction of the affairs of the partnership. The firm moneys were kept in two banks in Rodermond's name, and Rodermond signed all checks on those accounts. Ebell felt, however, that he could be put in a nasty position because of lack of proof, and that the others had him at a disadvantage which would be difficult to combat, and he became fearful of the disclosure threatened. Mrs. Ebell, who was also present, was stricken with fear on account of the threats of prosecution made by De Stephano, and she began to cry, and in order to save her husband from what she believed to be a criminal prosecution she said she was willing to convey all that she had to De Stephano to satisfy his claim.
On the following day, at the behest of De Stephano, a warranty deed was made conveying her real property, and a bill of sale was also executed covering all her personal property. The real estate was estimated to be worth about *Page 32 
$30,000, subject to mortgages amounting to about $14,000. The personal property was estimated to be worth about $15,000.
Contemporaneously with the execution of those instruments, a contract was entered into between Mr. and Mrs. Ebell of the one part and Louis De Stephano of the other, reciting the situation here outlined, and whereby the Ebells were to have the right to secure a reconveyance by De Stephano of the property thus conveyed, on or before January 1st, 1923, by the payment to him of $29,217, plus expenses and disbursements, and in the meantime they were to pay De Stephano rent for the premises at the rate of $175 per month, payable in advance.
Upon failure to thus redeem by January 1st, 1923, the Ebells were to vacate without further notice.
According to the testimony of Gregg, the bookkeeper for the firm, the maximum amount which was lost in the business venture was $7,040.46. The books of account do not show what became of the difference. It is to be borne in mind, however, that of the $13,700 originally contributed by Rodermond, $1,100 was to retained by Ebell absolutely. This left $12,600 for working capital. The net loss being $7,040.46, the most that Ebell could be charged with, by an actual calculation, is the difference between that amount and $12,600, which is $5,559.54. But the testimony in the present proceeding does not disclose the situation with regard to the details of the partnership affairs sufficiently to state an account between the parties. It may well be that, upon a strict accounting, the respective rights of the partners would show up in an entirely different light. However that may be, that is a situation in which the complainant Margaret Ebell does not figure; that is simply between Francesco Ebell and his co-partner or co-partners.
The transfer of the property referred to was completed on June 20th, 1922. On June 26th, still other counsel for De Stephano in New Jersey communicated with Ebell, as follows: *Page 33 
"Mr. Louis De Stephano has consulted me about your failure to observe your promises to him to make good his moneys which you appropriated to your own use. I have the papers covering the entire transaction before me. It is not necessary for me to relate any of the details. You are thoroughly familiar with them. If you do not make good by Wednesday morning, the 28th inst., I shall turn the matter over to the district attorney."
At the hearing De Stephano admitted that he had agreed with Mr. Ebell that if he and his wife would turn over their interest in their home and give him a bill of sale on all their personal property that he would then not press any criminal charge against Ebell. Ebell denied unequivocally that he had ever admitted misappropriating funds of the partnership, or that he felt that he was guilty of any such misappropriation.
The present bill was filed July 3d 1922, promptly after the conveyances aforementioned were made. Mrs. Ebell testified that from the beginning she felt that they had been wronged in the transaction, but that she had been impelled to do what she had done through fear caused by what De Stephano had said.
An accounting might show that there was a very small amount, if anything, due from Ebell to his partners. At the most, under the present testimony, it could not exceed about $5,600. De Stephano has claimed that he should be paid the whole amount of the original statement, which is contrary to the agreement. In any event, a simple calculation shows that the property thus extorted from Mrs. Ebell, who was without independent advice or the protection of counsel, is enormously in excess of any amount that could be found to be due from Ebell to his partners upon an accounting; and although the largest amount for which it would appear that Ebell could be liable to De Stephano is only about $5,600, nevertheless, by the agreement of redemption, the Ebells could not redeem their property except upon the payment of over $29,000, and that action was required to be taken within about six months, or the title would become absolute in De Stephano, automatically, and the Ebells would be forced to vacate without notice. *Page 34 
The agreement between the Ebells and Louis De Stephano entered into on June 20th, 1922, acknowledged the receipt by Margaret Ebell of the sum of $1,000 as part of the consideration for the transfer of the property.
Under the circumstances disclosed by the proofs in this case, I am convinced of the reasonable probability of the complainants having been coerced into the conveyance of their property by the threats and duress of De Stephano, and I am strengthened in that opinion because the unconscionably excessive amount exacted by him as the condition upon which the property thus secured from the Ebells could be redeemed by them.
I am clearly of the opinion that the conveyances of the real estate and the bill of sale of the personal property of the Ebells to De Stephano should be set aside, and that the property should be reconveyed, but the consideration of $1,000 should be returned to De Stephano, if, in fact, Mrs. Ebell received that sum as part consideration, thus placing De Stephano and Mrs. Ebell in statu quo. Ball v. Ball, 79 N.J. Eq. 170; Lomerson
v. Johnston, 20 Atl. Rep. 675; Schuster v. Arena,83 N.J. Law 79.
As between the complainant Francesco Ebell and the defendant De Stephano, not only does the bill pray for an accounting, but counsel for the complainants upon the hearing stated that "we stand ready to pay the money back that has been advanced on this deed, and will ask for an accounting as to whether or not there is any indebtedness existing between complainants and defendants."
Without expressing any opinion at this time with regard to the propriety of stating an account between the parties to the partnership agreement of March, 1922, because of the nature of the enterprise in which they thus engaged, and which can only be passed upon conclusively when the evidence pertaining thereto has been taken, and is before the court upon the accounting, I think that the accounting prayed for should be directed to be made. The special master, upon the reference, should find and determine specifically the nature of the business enterprise of the partnership, *Page 35 
whether or not it was such an enterprise as would be sanctioned by law, and what amount, if any, the parties may be liable for or entitled to receive, respectively, from the other. Pratt v.Boody, 55 N.J. Eq. 175; affirmed, 56 N.J. Eq. 429.
I will therefore advise a decree in accordance with these views.